## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TINA MARIE CATTERTON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00083 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Tina Marie Catterton, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Catterton filed her application for SSI on July 16, 2007, alleging disability as of June 1, 2005, due to back pain, spina bifida, scoliosis and nerve problems. (Record, ("R."), at 99-106, 132, 166.) The claims were denied initially and on reconsideration. (R. at 55-57, 60, 63-67.) Catterton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 68.) The hearing was held on October 5, 2009, at which Catterton was represented by counsel. (R. at 21-50.)

By decision dated January 4, 2010, the ALJ denied Catterton's claim. (R. at 13-20.) The ALJ found that Catterton had not engaged in substantial gainful activity since July 16, 2007, the date of her application. (R. at 15.) The ALJ determined that the medical evidence established that Catterton suffered from severe impairments, including a back disorder and colitis, but he found that Catterton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ found that Catterton had the residual functional capacity to perform a reduced range of light work.[1] (R. at 16-19.) Specifically, the ALJ found

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2011).

that Catterton could occasionally lift and carry items weighing up to 20 pounds, frequently lift and carry items weighing up to 10 pounds, stand for two to three hours in an eight-hour period and sit for six hours in an eight-hour period, provided she had the opportunity to change postural positions at reasonable intervals. (R. at 16.) The ALJ found that Catterton could not climb, crawl, operate automotive equipment or work at unprotected heights or around dangerous machinery. (R. at 16.) Thus, the ALJ found that Catterton was unable to perform her past relevant work. (R. at 19.) Based on Catterton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Catterton could perform other jobs existing in significant numbers in the national economy, including jobs as a cashier, a telephone clerk and an office clerk, all at the sedentary level[2] of exertion. (R. at 19-20.) The ALJ further concluded that Catterton could perform the jobs of a router, an information clerk and an interviewer, all at the light level of exertion. (R. at 20.) Therefore, the ALJ found that Catterton was not under a disability as defined under the Act and was not eligible for benefits. (R. at 20.) *See* 20 C.F.R. § 416.920(g) (2011).

After the ALJ issued his decision, Catterton pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 1-4.) Catterton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2011). The case is before this court on Catterton's motion for summary

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2011).

judgment filed May 2, 2011, and the Commissioner's motion for summary judgment filed May 27, 2011.

## II. Facts

Catterton was born in 1976, (R. at 99), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education with one year of college instruction. (R. at 136.) Catterton has past work experience as an assistant manager in a retail store, an associate/cashier at a major retail chain and a cashier/clerk in a retail store. (R. at 133.) Catterton testified that she has three children, ages 10, 15 and 17 at the time of the hearing. (R. at 28.) She stated that she last worked at Walmart as a cashier, but had to stop working due to "nerves" and back pain. (R. at 28-29.) She testified that she suffered from ulcerative colitis flare-ups twice monthly lasting from six to 10 days, requiring seven to 10 bathroom trips daily and resulting in excruciating pain, weakness and occasional dehydration. (R. at 29.) Catterton stated that her weight fluctuated approximately 11 pounds. (R. at 30.) She testified that she also suffered from back problems, including an L5 herniated disc, bulging discs at the L2 and L3 levels of the spine and spina bifida. (R. at 30-31.) Catterton testified that she stayed in excruciating pain all of the time. (R. at 31.) She stated that she was taking oxycodone and Robaxin. (R. at 31.) She stated that her doctor had prescribed a back brace for her, but her insurance would not pay for it. (R. at 34.) Catterton testified that her doctor had informed her that if the back brace did not work, surgery would be the only remaining option. (R. at 34.) Catterton testified that she had to lie down daily and that she required help around her house from her husband and 20-year-old sister who lived with them. (R. at 31-32.)

Catterton further testified that she suffered from migraine headaches every week or every two weeks lasting up to three days. (R. at 33.) She stated that she was not taking any medication for the migraines due to oxycodone use. (R. at 33.) Catterton testified that she also experienced "breakthrough migraines" which were not relieved with medication. (R. at 33.) She stated that these migraines were so severe at times that she had to receive Demarol shots from the emergency department. (R. at 33.) Finally, Catterton testified that she had an overactive thyroid, causing weight loss. (R. at 36.)

Dr. Ward Stevens Jr., M.D., a neurosurgeon, testified as a medical expert at Catterton's hearing. (R. at 38-46.) Dr. Stevens testified that Catterton's conditions did not meet any of the medical listings. (R. at 38.) He opined that neither Catterton's back impairments nor her colitis would be disabling. (R. at 39-40.) Specifically, he noted that Catterton did not technically have spina bifida, but a "spinal thesis Grade one[,]" which was a potential source of chronic low back pain, but which also was usually amenable to appropriate treatment. (R. at 39.) He further noted that, while Catterton had a "small, tiny rent in … the ligament and a small piece of disc in the midline[,]" this was not something "real serious" in nature. (R. at 39.) He further noted that this most likely was not part of Catterton's symptom complex and, again, was a "chronic annoying type of back problem that is amenable to treatment." (R. at 39.) Dr. Stevens opined that Catterton could lift items weighing up to 20 pounds, stand two to three hours in an eight-hour workday and sit most of the workday with normal breaks. (R. at 40-41.)

Dr. Stevens was asked to review the June 5, 2007, MRI report of Catterton's lumbar spine, which showed, in part, a flattening of the L5 nerve root and a

generalized bulging disc at L4, L5. (R. at 42.) Dr. Stevens opined that the radiologist, Dr. Kubota, was likely "over reading" the study and that a clinician would not place a lot of faith into such an interpretation unless there were obvious definite signs on examination to show anything of clinical significance. (R. at 43.) Dr. Stevens testified that flattening of the L5 nerve root may indicate compression, but if there was compression, there would be definite physical findings to suggest that, such as foot drop. (R. at 44.) Dr. Stevens also considered the September 11, 2009, MRI, stating that there was no evidence of overt neural effacement. (R. at 45.) He testified that he put more confidence in this more recent MRI because of the language used. (R. at 46.)

Bonnie Martindale, a vocational expert, also was present and testified at Catterton's hearing. (R. at 46-50.) She classified Catterton's past work as a cashier as light and semiskilled and her job as an assistant manager at a retail store as light and skilled. (R. at 46.) Martindale was asked to consider an individual of Catterton's age, education and work history who could lift items weighing up to 20 pounds occasionally and up to 10 pounds frequently, who could stand for two to three hours in an eight-hour workday, who could sit for six hours in an eight-hour workday, but would need some degree of a sit/stand option that allowed her to change positions once or twice per hour, who would need breaks of 10 to 15 minutes every two hours, who would be absent 12 to 18 days annually, who could not climb, who could not work at heights or around dangerous machinery, who could not operate automotive equipment, who could not crawl, who could occasionally bend, stoop and kneel and who could frequently reach. (R. at 47-48.) Martindale testified that such an individual could perform jobs existing in significant numbers in the national economy, including jobs as a cashier, a

telephone clerk and an office clerk, all at the sedentary level of exertion. (R. at 48-49.) Martindale further testified that such an individual could perform the jobs of a router, an information clerk and an interviewer, all at the light level of exertion. (R. at 49.) Finally, Martindale testified that an individual who would be absent 19 to 24 days annually could not perform any jobs. (R. at 49.)

In rendering his decision, the ALJ reviewed records from Lee Regional Medical Center; Dr. Mohammed Bhatti, M.D.; Holston Valley Imaging Center; Lee Internal Medicine and Family Care; Joseph I. Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Hossein Faiz, M.D.; Lee County Behavioral Health Services; Louis Perrott, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Appalachian Regional Healthcare; Harlan ARH Hospital; ARH Daniel Boone Clinic; Stone Mountain Health Services; Dublin Orthopaedic Center; and Gastroenterology Associates. Catterton's attorney submitted additional records from Dr. Joseph Onuh, M.D., and Harlan ARH Hospital to the Appeals Council.[3]

A May 16, 2007, x-ray of Catterton's lumbar spine showed spondylolysis and first degree spondylolisthesis at the lumbosacral junction, spina bifida at L5, straightening of the curvature and possible slight narrowing of the disc spaces at the lumbosacral junction. (R. at 212.) Catterton saw Dr. Mohammed Bhatti, M.D., a neurologist, on May 29, 2007, for complaints of worsening headaches. (R. at 216.) Catterton was fully alert and in no acute distress with normal bulk and tone

---

[3] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-4), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

of the muscles, 5/5 strength in all limbs and 1+ and symmetrical deep tendon reflexes. (R. at 216.) Sensory examination was normal. (R. at 216.) Dr. Bhatti diagnosed migraine headaches and lower back pain, among other things. (R. at 216.) He ordered an MRI of the brain and prescribed Depakote. (R. at 216.) A June 5, 2007, MRI of the lumbar spine showed a somewhat exaggerated lordotic curve with very mild spondylolisthesis at the L5-S1 level due to mild degenerative changes in the posterior facets. (R. at 222.) There also appeared to be some narrowing of the right L5-S1 neural foramen with some possible mild flattening of the right L5 nerve root in the foramen. (R. at 222.) There also were degenerative changes at the L4-5 level. (R. at 222.)

A June 14, 2007, x-ray of the lumbar spine showed spondylolysis and spondylolisthesis at the lumbosacral junction, mild scoliosis and spina bifida at L5. (R. at 214.) Catterton returned to Dr. Bhatti on June 26, 2007, with continued complaints of lower back pain, neck pain and headaches. (R. at 215.) Catterton had tenderness over the cervical and lumbosacral spine, and she had patchy sensory loss in all four extremities with 4/5 strength and 1+ and symmetrical deep tendon reflexes. (R. at 215.) Dr. Bhatti diagnosed cervical radiculopathy, peripheral neuropathy, lumbosacral radiculopathy and migraine headaches. (R. at 215.) He advised a nerve conduction study. (R. at 215.) An MRI of the brain dated August 8, 2007, showed a small amount of fluid in the mastoid air cells on the right side. (R. at 218.)

Catterton saw Dr. Asghar Ali, M.D., on September 14, 2007, reporting that her back pain was under fair control with pain management. (R. at 237.) She was diagnosed with low back pain and was continued on medication. (R. at 237.)

Oddly, Dr. Ali also diagnosed Catterton with anxiety disorder, although his report does not document any emotional, psychological or psychiatric symptoms. (R. at 237.) On September 25, 2007, Catterton had a synovial cyst removed from the flexor tendon of the left leg without complication. (R. at 585-88.) By December 18, 2007, Catterton had normal range of motion of the ankle and excellent pedal pulses. (R. at 263.)

Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Catterton on October 11, 2007, finding that she could perform light work. (R. at 256-62.) He found that she could occasionally perform all postural activities, and he imposed no manipulative, visual, communicative or environmental limitations. (R. at 258-59.) Dr. Surrusco stated that despite ongoing treatment, Catterton continued to have pain that significantly impacted her ability to perform work-related activities. (R. at 262.) Nonetheless, he found her allegations partially credible. (R. at 262.)

On November 15, 2007, Catterton saw Dr. Ali with complaints of continued low back pain, which she described as sometimes moderate to severe, but under fair control with medication. (R. at 236.) She reported occasional radiation of pain to the legs, but denied leg pain that day. (R. at 236.) Dr. Ali diagnosed low back pain and spina bifida at the L5 level of the spine, and he continued her medications. (R. at 236.) On January 15, 2008, Catterton again complained of intermittent low back under fair control with pain management. (R. at 235.) Her diagnoses and medications remained unchanged. (R. at 235.)

Dr. Joseph Duckwall, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment of Catterton on February 25, 2008, making identical findings as those of Dr. Surrusco. (R. at 312-18.) Dr. Duckwall also made the statement regarding Catterton's pain despite ongoing treatment, and he also found her statements to be partially credible. (R. at 318.)

A March 12, 2008, CT scan of Catterton's abdomen and pelvis showed a "small tiny cyst in the liver" and benign appearing follicular ovarian cysts. (R. at 579.) She was referred to a gastroenterologist, Dr. Jerry F. London, M.D., who she saw on May 6, 2008. (R. at 566-68, 579.) She complained of chills, fatigue, night sweats, itching, light sensitivity, upper and lower abdominal pain, abdominal swelling and bloating, dairy intolerance, diarrhea, flatulence and weight loss of greater than 10 pounds, among other things. (R. at 567.) Catterton was in no acute distress, and a physical examination revealed that her abdomen was normal consistency and had normal bowel sounds. (R. at 566-68.) Dr. London also noted that Catterton was very thin and mildly tender in the mid-hypogastrium area. (R. at 568.) The liver was normal size and consistency, and the spleen was not palpable. (R. at 568.) Dr. London diagnosed diarrhea, weight loss and a family history of malignant neoplasm of the gastrointestinal tract. (R. at 568.) He planned a colonoscopy and EGD. (R. at 568.) Dr. London believed the liver cysts were of little or no consequence, and he stated that Catterton's symptoms of diarrhea and weight loss could be colitis, celiac disease or irritable bowel syndrome. (R. at 568.)

A June 4, 2008, colonoscopy and EGD showed several small ulcerations in the terminal ileum, but the colonic mucosa appeared normal to the cecum. (R. at 596-98.) Biopsies were performed. (R. at 597.)

On July 2, 2008, Catterton reported that she was doing fairly well. (R. at 612.) She denied headache, and there was no cyanosis or edema of the extremities. (R. at 612.) Although Dr. Ali's record again documents no emotional psychological or psychiatric symptoms, Dr. Ali diagnosed anxiety disorder and back pain. (R. at 612.)

On July 28, 2008, Catterton underwent laparoscopy followed by lysis of a small bowel adhesion based on complaints of chronic pelvic pain. (R. at 321-22.) She was diagnosed with chronic pelvic pain with pelvic endometriosis and a small bowel adhesion. (R. at 321.) Catterton tolerated the procedure well. (R. at 322.) On July 30, 2008, Catterton presented to the emergency department at Lee Regional Medical Center with complaints of pain at the surgical site and low-grade fever. (R. at 361-63.) Palpation of the abdomen elicited tenderness in the suprapubic region, but bowel sounds were normal in all quadrants. (R. at 365.)

On August 1, 2008, Catterton saw Dr. Kiran Chennareddy, M.D., for a medication refill. (R. at 611.) She had mild tenderness to palpation at the lower lumbar paraspinal muscles. (R. at 611.) Dr. Chennareddy diagnosed back pain and gastroesophageal reflux disease, and he refilled her Lortab and Flexeril. (R. at 611.)

Catterton underwent a total abdominal hysterectomy with bilateral salpingo-oophorectomy and excision of the pelvic endometriosis on September 15, 2008, which she tolerated well. (R. at 332-33.) Catterton continued to see Dr. Chennareddy and Dr. Ali from September 23, 2008, through April 14, 2009. (R. at 602-10.) Over this time, she complained of worsened back pain, some swelling of

the legs and migraine headaches.  On September 23, 2008, Catterton was tender to palpation at the lower lumbar paraspinal muscles.  (R. at 610.)  On October 21, 2008, she reported that her back pain was under fair control with medication.  (R. at 609.)  Dr. Ali ordered an venous Doppler study of both legs.  (R. at 609.) On November 21, 2008, Catterton again reported doing better. (R. at 608.) On December 5, 2008, Catterton complained of migraine headaches, for which Midrin was prescribed.  (R. at 607.)  However, on December 19, 2008, she complained of persistent headache not helped by Midrin.  (R. at 607.)  Dr. Ali ordered an MRI of the brain.  (R. at 606.)  He also requested a neurologic consult and planned an EEG given Catterton's mother's history of seizure disorder.  (R. at 606.)  On January 15, February 13, March 13, and April 14, 2009, Catterton denied headache or leg swelling.  (R. at 602-05.)

A CT scan of the abdomen and pelvis dated April 30, 2009, was normal.  (R. at 583-84.)  Catterton presented to the emergency department at Lee Regional Medical Center on May 7, 2009, with complaints of bilateral abdominal and flank pain with nausea and right arm pain for the previous three days.  (R. at 580-82.)  Physical examination revealed abdominal tenderness and bilateral CVA tenderness.  (R. at 581.)  Catterton was diagnosed with tenosynotivis of the right arm/wrist and a urinary tract infection.  (R. at 581-82.)  She was continued on her medications and was prescribed Cipro.  (R. at 582.)

On May 12, 2009, Catterton reported having visited the emergency department for pain in the left arm.  (R. at 601.)  She also reported pain in the right thumb, for which she was wearing a wrist brace.  (R. at 601.)  She denied headache or leg swelling.  (R. at 601.)  Dr. Ali diagnosed tenosynovitis of the right thumb

and back pain, and her medications were refilled. (R. at 601.)  On June 12, 2009, Catterton reported a bout of migraine headaches, which had resolved.  (R. at 600.) Dr. Ali prescribed Robaxin.  (R. at 600.)

Catterton again presented to the emergency department at Lee Regional Medical Center on August 6, 2009, with complaints of low back pain with radiation to the right hip.  (R. at 589-91.)  She was diagnosed with degenerative disc disease and chronic low back pain.  (R. at 590-91.)  X-rays of the lumbar spine taken on August 17, 2009, showed bilateral L5 spondylolysis with minimal grade 1 anterior spondylolisthesis.  (R. at 592.)

On August 10, 2009, Dr. Chennareddy noted that although Catterton had followed up with a neurologist, she had not been able to try the new medication that was prescribed. (R. at 599.) She complained of back pain and intermittent headaches.  (R. at 599.)  Dr. Chennareddy diagnosed back pain, history of migraine headaches and osteoarthritis.  (R. at 599.)  Dr. Chennareddy ordered x-rays of the lumbar spine and advised her to follow-up with an orthopedic surgeon for further evaluation of her back problems and with a neurologist for evaluation of her headaches.  (R. at 599.)

An MRI of the lumbar spine dated September 11, 2009, showed bilateral pars defect at the L5 level and a small extrusion at the L4-5 level which was central-leftward.  (R. at 595.)  On February 2, 2010, Catterton saw Dr. Joseph Onuh, M.D., with complaints of dull low back pain, which radiated into the left leg. (R. at 624-25.) Physical examination showed mild tenderness of the lumbosacral spine over the paraspinal region, and straight leg raise testing was

negative bilaterally. (R. at 625.) Dr. Onuh diagnosed low back pain and migraine headaches, among other things. (R. at 625.) He refilled her medications. (R. at 625.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Catterton argues that the ALJ erred by failing to find that her back impairment meets the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §1.04. (Tina Catterton's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

I find Catterton's argument that the ALJ erred by failing to find that her back impairment meets the requirements of § 1.04 unpersuasive. Section 1.04 contains three subsections. The introductory paragraph to § 1.04 requires a claimant to show the following for all of the subsections: a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2011). Additionally, to meet the requirements of § 1.04(A), a claimant must show evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raise testing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2011). It is well-settled that a claimant must prove that she meets *all* of the requirements of a listing. *See Sullivan v. Zebley*, 493 U.S. 521. 530 (1990). For the following reasons, I find that substantial evidence supports the ALJ's finding that Catterton's back impairment does not meet the requirements of any of the subsections of § 1.04.

There is evidence in the record that Catterton suffers from a herniated nucleus pulposus at the L4-5 level of the lumbar spine. (R. at 595.) It is less clear whether this herniated nucleus pulposus results in compromise of a nerve root. There is a June 5, 2007, MRI of the lumbar spine interpreted by Dr. Richard T. Kubota, M.D., a radiologist, as showing possible mild flattening of the L5 nerve root. (R. at 222.) However, the medical expert, Dr. Stevens, testified that a clinician would not put a lot of faith into this interpretation and that it did not necessarily mean that there was a compromise of a nerve root. (R. at 41-44.) In

fact, he testified that a compromise of a nerve root would result in definite clinical signs, such as foot drop, which Catterton did not exhibit. (R. at 44.) Catterton argues that Dr. Stevens's testimony should not be given controlling weight, but even if the ALJ were to have found that Catterton did have nerve root compromise, she still cannot meet all of the requirements of § 1.04(A). Specifically, while it can be argued that Catterton shows evidence of neuro-anatomic distribution of pain and motor loss accompanied by sensory or reflex loss, there simply is no evidence of limitation of motion of the spine or positive straight leg raise testing. That being the case, because Catterton's back impairment does not meet all the requirements of § 1.04(A), I find that substantial evidence supports the ALJ's finding that she does not meet this medical listing.

Next, to meet the requirements of § 1.04(B), in addition to the introductory requirements, a claimant must show spinal arachnoiditis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(B) (2011). The record is clear that Catterton has never been diagnosed with spinal arachnoiditis. Therefore, I find that substantial evidence supports the ALJ's finding that Catterton's back impairment does not meet this medical listing.

Finally, to meet the requirements of § 1.04(C), in addition to the introductory requirements, a claimant must show lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C) (2011). Pseudoclaudication refers to intermittent limping. *See* DORLAND'S ILLUSTRATED MEDICAL Dictionary, ("Dorland's"), at 343, 1377 (27th ed. 1988).

There simply is no evidence of intermittent limping. Even if there were such evidence, there is no evidence that Catterton cannot ambulate effectively. The regulations specify that to ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must be able to travel without companion assistance to and from a place of employment or school. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(b)(2) (2011). Some examples of ineffective ambulation include, but are not limited to, the inability to walk without a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(b)(2). Here, none of the treating sources, the state agency physicians or the medical expert placed any restrictions on Catterton's ability to walk. There is no evidence that Catterton had to use any type of assistive device to walk. Furthermore, Catterton stated in an undated Function Report that she could go out alone and that she shopped weekly. (R. at 144.) She further stated that she could walk for half a mile before needing to stop and rest. (R. at 146.) In another undated Function Report, Catterton stated that she was able to take her children to and from school and go to doctor's appointments. (R. at 176.) She again stated that she could go out alone and that she could walk half a mile before stopping to rest. (R. at 179, 182.) It is for all of these reasons that I find that substantial evidence supports the ALJ's finding that Catterton's back impairment does not meet the requirements of § 1.04(C).

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's finding that Catterton's back impairment does not meet the requirements for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. I further find that the ALJ's residual functional capacity finding is supported by substantial evidence. The ALJ found that despite her severe impairments of a back disorder and colitis, Catterton could lift and carry items weighing up to 20 pounds occasionally, frequently lift and carry items weighing up to 10 pounds, stand for two to three hours in an eight-hour period and sit for six hours in an eight-hour period, provided she had the opportunity to change postural positions at reasonable intervals. (R. at 16.) The ALJ further found that Catterton could not climb, crawl, operate automotive equipment or work at unprotected heights or around dangerous machinery. (R. at 16.) The vocational expert testified that an individual of Catterton's age, education and work history who also had these limitations could perform jobs existing in significant numbers in the national economy, including jobs as a cashier, a telephone clerk and an office clerk, all at the sedentary level of exertion, and a router, an information clerk and an interviewer, all at the light level of exertion. (R. at 48-49.)

I first note that despite Catterton's back disorder, diagnostic testing results were relatively mild and, in any event, clinical findings were essentially unremarkable. For instance, in May 2007, Catterton had normal muscle bulk and tone, full strength in all limbs, 1+ and symmetrical deep tendon reflexes and normal sensory examination. (R. at 216.) In June 2007, she had tenderness over the cervical and lumbosacral spine, as well as patchy sensory loss in all extremities, 4/5 strength and 1+ and symmetrical deep tendon reflexes. (R. at 215.) In August 2008, Catterton had mild tenderness to palpation at the lower lumbar paraspinal

muscles. (R. at 611.) In February 2010, physical examination showed only mild tenderness of the lumbosacral spine over the paraspinal region, and straight leg raise testing was negative bilaterally. (R. at 625.) In addition to unremarkable clinical findings, both state agency physicians opined that Catterton could perform light work with the occasional performance of all postural activities. (R. at 256-62, 312-18.) Likewise, the medical expert, Dr. Stevens, a neurosurgeon, opined that Catterton could lift items weighing up to 20 pounds, stand two to three hours in an eight-hour workday and sit most of the workday with normal breaks. (R. at 40-41.) Finally, I note that, while Catterton's back pain waxed and waned, on September 14, 2007, November 15, 2007, January 15, 2008, July 2, 2008, October 21, 2008, and November 21, 2008, she reported that it was under fair control with pain management. (R. at 235, 236, 237, 608, 609, 612.) It is well settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Thus, for these reasons, I find that substantial evidence supports the ALJ's residual functional capacity finding, and I further find that substantial evidence supports the ALJ's finding that Catterton is not disabled and not entitled to SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Catterton's back impairment does not meet the medical listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04;

2. Substantial evidence exists in the record to support the ALJ's physical residual functional capacity finding; and

3. Substantial evidence exists in the record to support the ALJ's finding that Catterton was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Catterton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:        November 17, 2011.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE